UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY J. SUMMERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21-CV-1390-ACL |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Plaintiff Timothy J. Summers brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Summers' severe impairments, he was not disabled as there were jobs existing in significant numbers that he could perform.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

**I.  Procedural History**

Summers filed his application for benefits on June 18, 2019.   (Tr. 88-89.)   He claimed he became unable to work on November 24, 2018, due to a herniated disc in his neck, epilepsy,

short-term memory difficulties, autism, attention deficit hyperactivity disorder ("ADHD"), asthma, sleep issues, depression, and anxiety.   (Tr. 289.)   Summers was 36 years of age at his alleged onset of disability date.   (Tr. 30.)   His application was denied initially.   (Tr. 128-36.) Summers' claim was denied by an ALJ on March 17, 2021.   (Tr. 16-32.)   On September 29, 2021, the Appeals Council denied Summers' claim for review.   (Tr. 1-4.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Summers first argues that the ALJ erred by failing to "identify the claimant's autism spectrum disorder as a severe impairment, with resulting functional restrictions."   (Doc. 17 at 5.)   He next argues that the ALJ erred in failing "to consider properly whether Summers met or equaled listing 12.10."   *Id.* at 7.   Summers also contends that the ALJ failed to "properly evaluate Summers' limitations in concentration, persistence and pace."   *Id.* at 9.   Finally, he argues that the ALJ failed to "properly evaluate Summers' limitations in social functioning."   *Id.* at 10.

## II.   The ALJ's Determination

The ALJ first found that Summers met the insured status requirements of the Social Security Act through December 31, 2021.   (Tr. 18.)   He stated that Summers has not engaged in substantial gainful activity since his alleged onset date.   *Id.*   In addition, the ALJ concluded that Summers had the following severe impairments: degenerative disc disease, seizure disorder, ADHD, and a social anxiety disorder.   *Id.*   The ALJ found that Summers did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.   (Tr. 19.)

As to Summers's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can never climb ladders, ropes, or scaffolds, never crawl, and never balance as the latter term is defined in the Selected Characteristics of Occupational Exploration.   He can occasionally climb ramps and stairs, stoop, kneel, and crouch.   He can occasionally reach overhead and frequently reach in all other directions bilaterally.   He can frequently handle and finger.   He should avoid concentrated exposure to excessive vibration, extremes of heat and cold, and pulmonary irritants.   He should avoid all exposure to workplace hazards such as operational control of moving machinery, hazardous machinery, and unprotected heights.   He is limited to simple, routine, repetitive tasks with occasional, simple work-related decisions.   He is limited to jobs that can be learned by demonstration.   He should work with things more than people.   He can tolerate minimal changes in work setting or routine, with no paced production quotas.   Public contact should be incidental to work tasks.   He can have occasional contact with coworkers, no tandem tasks, and occasional supervision.

(Tr. 22.)

The ALJ found that Summers was unable to perform any of his past relevant work, but was capable of performing other work existing in substantial numbers in the national economy. (Tr. 30-31.)   For example, Summers could perform the positions of sandwich board carrier, usher, and ironer.   (Tr. 31.)   The ALJ therefore concluded that Summers was not under a disability, as defined in the Social Security Act, from November 24, 2018, through the date of the decision.   (Tr. 32.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on June 18, 2019, the claimant is not disabled as defined in sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income

protectively filed on June 18, 2019, the claimant is not disabled
under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and
    non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's
        impairments.

6.      The testimony of vocational experts when required which is
        based upon a proper hypothetical question which sets forth the
        claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal

citations omitted).   The Court must also consider any evidence which fairly detracts from the

Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v.

Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as

a whole, we must affirm the administrative decision, even if the record could also have supported

an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal

quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974,

977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls

outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015)

(citation omitted).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than

twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."   *Page v.*

*Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is

other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next, the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must

determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2),

416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating

of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental

disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal

the listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§

404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

Summers argues that the ALJ erred in failing to identify his autism spectrum disorder[1]

("ASD") as a severe impairment, failing to address the listing for ASD, and in evaluating his

mental[2] limitations when determining his RFC.   The undersigned will discuss Summers' claims

in turn.

### 1.   Severity Determination

At step two of the sequential evaluation, the ALJ found that Summers' ADHD and social

anxiety disorder were severe impairments, but did not include ASD as a severe impairment.

(Tr. 18.)   Summers contends that the ALJ's failure to find ASD as a severe impairment was

reversible error.

Under the Social Security regulations, a severe impairment is "an impairment or

combination of impairments that significantly limits a claimant's physical or mental ability to

perform basic work activities."   20 C.F.R. §§ 416.920(c), 416.921.   The claimant bears the

---

[1]Autism spectrum disorder is a developmental disorder that often interferes with a person's
ability to communicate with and relate to others.   *See* https://www.webmd.com/brain/autism/
understanding-autism-basics (last visited March 30, 2023).
[2]Although Summers also alleged the presence of disabling physical impairments, he does not
challenge the ALJ's findings as to his physical limitations.   As such, the Court's discussion will
be limited to Summers' mental impairments.

burden of proving that his impairment or combination of impairments are severe.   *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)).

The ALJ explicitly discussed Summers' allegation of ASD.   He stated that the medical evidence "does not contain a firm diagnosis of an autism spectrum disorder, including Asperger's disorder."  (Tr. 19.)   The ALJ explained that Summers underwent neuropsychiatric testing in November 2019, performed by Laura Nieder, Ph.D.   (Tr. 19, 744.)   After the examination, Dr. Nieder stated that Summers "appears to meet the criteria for a diagnosis of ASD (Asperger's) of mild severity."  (Tr. 19, 753.)   The ALJ noted that Dr. Nieder did not, however, "confirm the diagnosis," instead leaving "uncertainty in the diagnosis."  (Tr. 19.)   The ALJ stated that Summers' neurologist subsequently relied upon Dr. Nieder's examination when he stated that Summers had an ASD.   *Id.*   The ALJ, therefore, found that ASD and Asperger's disorder were considered nonmedically-determinable impairments.   *Id.*   He stated that, although ASD was not affirmatively diagnosed, "the claimant's difficulties in socialization, memory, cognition, and attention were considered and accounted for within the residual functional capacity."  *Id.*

The ALJ's evaluation of Summers' ASD turns on Dr. Nieder's report.   A summary of Dr. Nieder's November 14, 2019 neuropsychological assessment is provided below:

Dr. Nieder noted that Summers was 37 years of age and had a history of seizure disorder that began in 2016.   *Id.*   Summers' mother was present during the interview.   *Id.*   Dr. Nieder indicated that Summers complained of increasing memory difficulties at a February 2019 neurological consultation.   *Id.*   Summers also has a lifelong history of ADHD.   *Id.*   In recent years, it "has been suggested that Mr. Summers may have an autism spectrum disorder although

he has not yet had formal assessment." *Id.*   Summers earned a Bachelor's degree in Digital
Entertainment & Game Design.   (Tr. 745.)   He worked various jobs, including clerking at
Target.   *Id.*   Most recently, he worked as a machine operator.   *Id.*   He was placed on long-term
disability when he began having seizures in 2016.   *Id.*   Summers lived with his parents and has
never lived independently.   *Id.*   Summers and his mother reported that Summers had
experienced some difficulty with cognition all his life due to his attention problems, although
they believed his memory had worsened over the past few years, after the onset of seizures in
2016.   (Tr. 746.)   Summers' mother indicated that Summers forgets to do things around the
house, has difficulty remembering what to buy at the store, occasionally forgets to take his
medications, tends to repeat himself, and has difficulty recalling details from recent
conversations.   (Tr. 746.)   Summers participated in speech and occupational therapy in late
2017 and early 2018 after developing seizures.   *Id.*   He was taught different compensatory
strategies, such as using a memory book.   *Id.*   Summers had never been married and had never
had a significant relationship.   *Id.*   He did not generally socialize beyond friends he met on
social media.   *Id.*   He spends much of his time reading and playing video games.   *Id.*
Summers also helps his mother with homework associated with earning her GED.   *Id.*
Summers' mother reported Summers tends to work better by himself, as he does not relate well
to others.   *Id.*   Summers was independent in all self-care activities, although he may forget to
shave at times.   *Id.*   He is able to cook simple meals, care for his space, and care for his two
dogs and lizard.   (Tr. 747.)

On examination, Summers was casually dressed and appropriately groomed.   *Id.*   He
evidenced the following autistic spectrum features: poor eye contact, interruptions when
listening, and decreased awareness of social cues.   *Id.*   His speech was spontaneous but notable

for stuttering at times. *Id.* Summers had difficulty sustaining his attention on examination, was fidgety, and evidenced impulsivity at times. *Id.* He was observed to focus on unimportant details at times (such as straightening task materials), rather than more important factors (such as speed on timed tasks). *Id.* He was able to comprehend simple task instructions without difficulty, was oriented to temporal and spatial information, tolerated frustration well, and his thought process was typically goal-directed. *Id.* Summers appeared to have poor self-confidence, but overall put forth adequate effort. *Id.*

Dr. Nieder administered testing, which revealed average intellectual functioning with a neurocognitive profile suggestive of subtle to mild cognitive inefficiencies. (Tr. 752.) Summers had difficulties in mental processing speed, working memory, confrontation naming, math computation, and susceptibility to intrusion errors. *Id.* Summers was generally able to learn and retain information at normal levels, but these abilities were limited when he was anxious. *Id.* Dr. Nieder stated that it appears that Summers' subjective complaints of declining memory was actually due to attention difficulties when information is being presented. *Id.* She further indicated that Summers' emotional state may be playing a larger role in his subjective complaints. (Tr. 753.) Dr. Nieder explained that Summers' emotional state appears to have been primarily affected by his loss of employment and reduced independence since the onset of his seizures. *Id.* Summers retained "significant cognitive strengths in general fund of information, reasoning, novel problem-solving, and visuoconstruction skills." *Id.* Dr. Nieder stated that, although the purpose of her evaluation was to delineate Summers' current level of neurocognitive functioning, "Mr. Summers appears to meet criteria for a diagnosis of Autism Spectrum Disorder (Asperger's) of mild severity." *Id.* She explained that Summers experiences difficulty with social communication and interpretation, and appears to have

restricted interests and routines.   *Id.*   Given Summers' "lifelong difficulties in these areas," Dr.
Nieder stated that Summers was "likely eligible" for services through the Missouri Division of
Developmental Disabilities.   *Id.*

Summers saw treating neurologist Dr. Snyder for follow-up on December 14, 2020, at
which time he noted that Dr. Nieder's neuropsychology testing revealed Summers "has had life-
long autism spectrum disorder, most likely Asperger's."   (Tr. 846.)   Dr. Snyder included
"Asperger syndrome" as a diagnosis.   (Tr. 847.)

Summers argues that Dr. Nieder only used the word "appears" in her diagnosis because
she lacked information regarding Summers' longitudinal history.   (Tr. 768.)   He contends that
the ALJ erred in finding ASD non-severe, which affected his evaluation of the remainder of his
analysis.

Defendant argues that the ALJ's failure to find ASD a severe impairment did not impact
the evaluation of the remainder of the case.   Defendant states that Plaintiff's argument is "one of
semantics rather than substance," as the ALJ found Plaintiff had the severe mental impairments
of social anxiety and ADHD and the "symptoms stemming from these conditions overlap with
those caused by [ASD]."   (Doc. 20 at 5.)

Plaintiff responds that Defendant's argument "that there is merely a 'semantic' difference
between autism and 'social anxiety and ADD'" is an "extraordinary assertion" for which there is
no medical support.   (Doc. 21 at 3.)   Plaintiff further contends that, because the ALJ did not cite
this rationale in his decision, Defendant's argument violates the *Chenery* doctrine.[3]

---

[3]The *Chenery* doctrine originated in *SEC v. Chenery*, 318 U.S. 80 (1943).   It stands for the
proposition that "a reviewing court may not uphold an agency decision based on reasons not
articulated by the agency itself in its decision."   *HealthEast Bethesda Lutheran Hosp. and
Rehabilitation Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998) (quoting *Mayo v. Schiltgen*, 921
F.2d 177, 179 (8th Cir. 1990)).

Eighth Circuit "precedent indicates that the failure to list a specific impairment at step two is not an error unless the impairment is 'separate and apart' from the other listed impairments."  *Gregory v. Comm'r, Soc. Sec. Admin.*, 742 F. App'x 152, 156 (8th Cir. 2018) (quoting *Gragg v. Astrue*, 615 F.3d 932, 939 (8th Cir. 2010)).

Additionally, a failure to find an impairment severe at step two "may be harmless where the ALJ continues with the sequential evaluation process and considers all impairments, both severe and non-severe."  *Haley v. Colvin*, No. 2:13CV29 CDP, 2014 WL 117575, at *10 (E.D. Mo. Jan. 13, 2014) (citing *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010); *see also Weed v. Saul*, No. 4:18-CV-001192-SPM, 2019 WL 4451259, at *4 (E.D. Mo. Sept. 17, 2019) (ALJ's error in failing to consider sleep apnea at step two harmless because ALJ considered all of plaintiff's symptoms, including those associated with sleep apnea, which claimant testified overlapped entirely with her symptoms from fibromyalgia, which the ALJ did consider); *Spainhour v. Astrue*, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments at step 2, such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC."); *Givans v. Astrue*, No. 4:10-CV-417-CDP, 2012 WL 1060123, at *17 (E.D. Mo. March 29, 2012) (holding that even if the ALJ erred in failing to find one of the plaintiff's mental impairments to be severe, the error was harmless because the ALJ found other severe impairments and considered both those impairments and the plaintiff's non-severe impairments when determining the RFC).

First, Plaintiff misstates Defendant's argument.   Defendant does not suggest that there is merely a semantic difference between the disorders of ASD, ADHD, and social anxiety.   Rather, Defendant suggests that the ALJ's failure to find ASD a severe impairment was not impactful because the ALJ still considered Plaintiff's ASD symptoms in assessing his RFC.   The ALJ specifically stated that, although ASD was not "affirmatively diagnosed, the claimant's difficulties in socialization, memory, cognition, and attention were considered and accounted for within the residual functional capacity."   (Tr. 19.)   As such, the *Chenery* doctrine is not implicated.

Second, there is support for the ALJ's finding that Dr. Nieder did not affirmatively diagnose Summers with ASD.   As the ALJ noted, Dr. Nieder's statement that Summers "appears to meet criteria" for ASD, however, "did not confirm the diagnosis."   (Tr. 19.)   Dr. Nieder also indicated that the purpose of her evaluation was to assess Summers' neurocognitive functioning rather than assess for ASD.   (Tr. 753.)   Dr. Snyder then relied upon Dr. Nieder's alleged diagnosis in subsequently assessing Summers with Asperger's syndrome.

Further, even if the ALJ erred in failing to include ASD as a severe impairment, this error was harmless.   Notably, to the extent Dr. Nieder intended to diagnose Summers with ASD, she found that the disorder was "of mild severity."   *Id.*   As discussed below, the ALJ adequately considered all of Summers' ASD symptoms as set out by Dr. Nieder when assessing whether he met a listing and in determining his RFC.

Accordingly, the ALJ's failure to include ASD as a severe impairment at step two was not reversible error.

## 2.  Listing

Summers next argues that the ALJ erred in failing to properly consider whether Summers

met or equaled listing 12.10, the listing for autism spectrum disorders.

After consideration of severe impairments at step two, the ALJ is to advance to step three and determine whether the impairments meet the criteria of any listings.   "If the impairments meet or equal one of the listed impairments [in 20 C.F.R. pt. 404, subpt. P, app. 1], the claimant is conclusively presumed to be disabled."   *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "To meet a listing, a claimant must show that he or she meets all of the criteria for the listed impairment."   *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).

Listing 12.10 addresses autism spectrum disorders, which are "[c]haracterized by qualitative deficits in the development of reciprocal social interaction, verbal and nonverbal communication skills, and symbolic or imaginative activity; restricted repetitive and stereotyped patterns of behavior, interests and activities; and stagnation of development or loss of acquired skills early in life."   20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B8.   Listing 12.10 is met when both the A and B criteria are satisfied.   *Id.* at §12.10.   The A criteria requires medical documentation of *both* of the following:   (1) qualitative deficits in verbal communication, nonverbal communication, and social interaction; and (2) significantly restricted, repetitive patterns of behavior, interests, or activities.   *Id.*   The B criteria is satisfied when one extreme limitation or two marked limitations of the following are present:

1. Understand, remember, or apply information;

2. Interact with others;

3. Concentrate, persist, or maintain pace;

4. Adapt or manage oneself.

*Id.*

Here, the ALJ found that Summers' mental impairments did not meet or equal a listed impairment. (Tr. 19.) The ALJ did not discuss Listing 12.10, but analyzed Listings 12.02 and 12.11, the listings for neurocognitive disorders and neurodevelopmental disorders, respectively. (Tr. 20-21.) Regardless, to satisfy the paragraph B criteria in Listings 12.02, 12.11, *and* 12.10, the mental impairments must result in at least one extreme or two marked limitations including "understanding, remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.10.

In the area of understanding, remembering, or applying information, the ALJ found Summers had a moderate limitation. (Tr. 20.) He explained that Summers reported issues with short-term memory, but his neuropsychiatric examination showed only subtle to mild cognitive inefficiencies. *Id.* The ALJ noted that Dr. Nieder felt that Summers' subjective complaints of memory decline were due to his attention deficits. *Id.* Summers does not appear to challenge this finding.

The ALJ next found that Summers had marked limitation in his ability to interact with others. *Id.* The ALJ cited findings on examination of decreased eye contact, some neurogenic stuttering, word-finding difficulty, interrupting others, abnormal speech patterns, decreased social cues, and decreased self-confidence. (Tr. 20, 393, 680, 763.) Additionally, Summers reported being uncomfortable with phone conversations and in social situations, had no history of significant romantic relationships or friendships, and had difficulties working in a group. *Id.* The ALJ noted that Summers also reported that he spent time with family and friends, used social media, gamed with others, had no problems getting along with others, and had no

problems getting along with authority figures.  *Id.*  Summers does not dispute the presence of marked limitations in his ability to interact with others.

With regard to Summers' ability to adapt or manage himself, the ALJ found Summers had a mild limitation.  (Tr. 21.)  The ALJ explained that Summers reported that he cared for his dogs, had no issues with his personal care, prepared simple meals, performed household chores, was able to drive and go out alone, shopped for personal and household items, reported numerous hobbies and interests including gaming and building plastic models, handled stress well, and had no issues with changes in routine.  *Id.*  Summers does not object to this finding.

Finally, the ALJ found that Summers had moderate limitation in his ability to concentrate persist, or maintain pace.  (Tr. 20.)  The ALJ pointed out that Summers complained of difficulty completing tasks, yet he reported he could play video games or use a computer for two to three hours at a time.  *Id.*  In his neuropsychiatric examination, Summers had difficulty sustaining attention, was fidgety during examination, focused on some unimportant details rather than more important factors, and had attention deficits when information was presented that impacted his memory.  (Tr. 21, 747.)  The ALJ also discussed findings from a November 2019 psychological evaluation performed by Thomas Spencer, Psy.D.  (Tr. 678-80.)  The ALJ noted that Summers reported difficulties staying on task and multi-tasking, was fidgety and restless during the examination, completed serial 3s slowly with no errors, and completed simple arithmetic.  (Tr. 20, 678-79.)  Dr. Spencer expressed the opinion that Summers has mild to moderate impairment in his ability to learn, recall, and use information and to consistently stay on task.  (Tr. 680.)  The ALJ concluded that Summers has a moderate limitation in this area "due to difficulties completing tasks and focusing, fidgeting, restlessness, and a tendency to focus on unimportant details."  (Tr. 21.)

Summers argues that the ALJ erred in evaluating his limitation in concentration, persistence, and pace by emphasizing Summers' ability to play video games and failing to consider the entire record.   He specifically contends that the ALJ failed to consider a vocational rehabilitation evaluation that was performed by Delores E. Gonzalez, M.Ed., L.P.C., in August 2019.   (Tr. 311-35.)   Summers notes that Ms. Gonzalez found that he "displayed problems with focus, memory, and concentration," was tangential, "displayed an abnormal affect and behavior," "seemed very immature," "had significant word finding problems," and "had to think for a few minutes before answering questions."   (Tr. 312.)   Ms. Gonzalez concluded that Summers' impairments "remain significant despite therapy and regular medical attention and treatment and have continued to affect his ability to perform basic work-related functions."   (Tr. 335.)

Defendant responds that the ALJ properly considered the record as a whole, including treatment records and Summers' reports of daily activities, when finding moderate limitations in concentration, persistence, or pace.   Regarding Ms. Gonzalez's opinion, Defendant argues that the ALJ was aware of her opinion, but the regulations do not require that the ALJ discuss the opinion of non-medical sources.

The undersigned finds that the ALJ's determination that Summers has moderate limitations in concentration, persistence, or pace is supported by substantial evidence.   The ALJ cited findings on examination of Drs. Nieder and Spencer, as well as Summers' testimony regarding his daily activities.   Summers' ability to play video games for two to three hours at a time is one factor supporting the ALJ's determination that he has moderate, rather than marked, limitations in his ability to concentrate.   *See Eich v. Saul*, No. 4:19CV1686 HEA, 2020 WL 7078684, at *6 (E.D. Mo. Dec. 3, 2020) (observation that claimant's "concentration was good" was supported by evidence that claimant played video games); *Vogler v. Saul*, No. 1:20CV01

CDP, 2020 WL 6287412, at *7 (E.D. Mo. Oct. 27, 2020) (claimant's ability to play video games and watch movies supported ALJ's conclusion that claimant was only mildly limited in concentration, persistence, or pace); *Hewitt v. Colvin*, No. 2:13CV104 ACL, 2015 WL 1286309, at *11, 13 (Mar. 20, 2015) (playing video games requires a level of concentration).

It is true the ALJ did not discuss Ms. Gonzalez's opinion in his opinion.   As Defendant points out, the ALJ was aware of Ms. Gonzalez's report, as he questioned Summers about her findings at the hearing.   (Tr. 52.)   The ALJ is not required to discuss every piece of evidence in the record, and his failure to cite specific evidence does not indicate that he did not consider it. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).   Moreover, Ms. Gonzalez, as a licensed professional counselor, is not a "medical source" whose opinion the ALJ is required to discuss. *See* 20 C.F.R. §§ 404.1502,1502c(d). 416.902c(d) ("We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section").

In sum, the ALJ's determination at step 3 that Summers' mental impairments do not satisfy the paragraph B criteria because they do not cause at least two marked limitations or one extreme limitation is supported by substantial evidence.   Thus, any error resulting from the ALJ's failure to consider listing 12.10 is harmless.

### 3.  RFC

Summers argues that the ALJ's RFC determination is erroneous because he failed to properly evaluate Summers' limitations in social functioning.   He contends that the record supports greater limitation in his contact with co-workers and supervisors.

Defendant argues that the ALJ's RFC determination is supported by substantial evidence, and Summers' argument merely provides an alternative view of the evidence.

A claimant's RFC is the most he can do despite his physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).

The ALJ found that Summers had the following mental limitations:

> He is limited to simple, routine, repetitive tasks with occasional, simple work-related decisions.   He is limited to jobs that can be learned by demonstration.   He should work with things more than people.   He can tolerate minimal changes in work setting or routine, with no paced production quotas.   Public contact should be incidental to work tasks.   He can have occasional contact with coworkers, no tandem tasks, and occasional supervision.

(Tr. 22.)

As previously discussed, the ALJ found at step three that Summers had a marked limitation in his ability to get along with others.   (Tr. 20.)   In determining Summers' RFC, the ALJ again discussed Summers' statements about his social limitations and the findings of various medical professionals on examination.   For example, the ALJ cited Summers' testimony that he spent time with family and friends, got along well with others, had no problems getting along with authority figures, and got along well with his supervisor at his last job; but he

stuttered "all the time," had anxiety, and did not often socialize with friends in person.   (Tr. 22-23, 348, 60-61.)   Summers reported to an occupational therapist that he feels uncomfortable with phone conversations.   (Tr. 24, 390.)   Therapy records noted neurogenic stuttering, word-finding difficulties, and decreased eye contact.   (Tr. 24, 391-93.)   The ALJ discussed Dr. Nieder's report that Summers had difficulty maintaining conversation and did not enjoy social chitchat, exhibited poor eye contact, interrupted when listening, had decreased awareness of social cues, stuttered at times, and had poor self-confidence.   (Tr. 25, 763.)   He also noted Dr. Spencer's findings that Summers seemed anxious, fidgeted, stuttered when he spoke, had intermittent eye contact, had few friends, and had limited communication with others; but had a decent working knowledge of social norms and had no language impairment.   (Tr. 25, 680.) Dr. Spencer diagnosed a social anxiety disorder.   *Id.*

The ALJ next discussed the medical opinion evidence.   He noted James Morgan, Ph.D. offered opinions in a prior administrative determination on December 3, 2019.   (Tr. 27, 102.) Dr. Morgan found Summers had moderate limitations in interacting with others, and in maintaining concentration, persistence, and pace; and mild limitations in the other areas.   *Id.* The ALJ found Dr. Morgan's opinion that Summers had moderate limitations in maintaining concentration, persistence, and pace persuasive, but found that the medical evidence supports greater limitations in his social functioning due to poor eye contact, stuttering, word-finding issues, a tendency to interrupt others, and unease in social situations, which are consistent with marked limitations.   (Tr. 27.)

The ALJ discussed the opinions provided by Dr. Nieder following her neuropsychiatric examination.   (Tr. 28.)   Dr. Nieder found that Summers was capable of managing household finances, medications, and cooking with occasional recommended observation for accuracy.

(Tr. 28, 753.)   She recommended that Summers engage in social activities, and felt he would benefit from a position that was structured, involved clear routines, and had well-established expectations.   *Id.*   Dr. Nieder believed Summers' likelihood of success in tasks increased with routine structure.   *Id.*   The ALJ found Dr. Nieder's statements consistent with the ability to perform simple, routine work, with a limitation to repetitive work and only occasional simple work-related decisions that can be learned by demonstration.   *Id.*

Additionally, Dr. Spencer offered opinions after his consultative examination.   (Tr. 29, 680.)   Dr. Spencer found that Summers had mild to moderate impairment in his ability to learn, recall, and use information and to consistently stay on task; and moderate to marked impairment in his ability to relate to and work with others on a consistent basis.   (Tr. 680.)   Summers could manage his benefits without assistance.   *Id.*   The ALJ found Dr. Spencer's opinions generally persuasive, noting that the evidence was consistent with a marked limitation in interacting with others due to his difficulties with eye contact, stuttering, maintaining a flow of conversation, and social unease.   (Tr. 29.)

Finally, the ALJ considered the opinions offered by occupational therapist Deborah Turley, OT.   (Tr. 29, 393.)   On April 22, 2019, Ms. Turley stated that Summers was "currently not ready to attempt to re-enter the work force," and that he was "probably better suited socially to attempt to go back to a job that has minimal customer contact and less co-worker socialization."   (Tr. 393.)   The ALJ stated that Ms. Turley's opinion that Summers would benefit from limited customer contact and co-worker socialization is supported by the whole of the medical evidence, which supports social limitations, social unease, and some difficulties communicating well with others.   (Tr. 29.)

The undersigned finds that the ALJ properly assessed Summers' social limitations. Summers argues that there is no support for the ALJ's finding that he should have only incidental contact with the public but occasional contact with co-workers and supervisors.   He argues that "[n]one of the evidence of opinions in the file contain this specific limit and it [is] unclear what the ALJ based this limit upon."  (Doc. 17 at 11.)   To the extent Summers suggests that his RFC should have been determined or confirmed by a medical source, he is mistaken.   As stated above, it is the ALJ's role to evaluate the record in its entirety, including medical opinions and testimony, and formulate a claimant's RFC based on all the relevant, credible evidence of record. *See Perks*, 687 F.3d at 1092.   This is precisely what the ALJ did in this case.

The ALJ performed an exhaustive review of the medical evidence, Summers' testimony, and the medical opinion evidence.   Based on this evidence, the ALJ found Summers had marked impairment in his social functioning.   As a result, he imposed extensive limitations in Summers' ability to interact with others in the workplace, including a restriction to working "with things more than people."  (Tr. 22.)   The ALJ limited Summers to public contact that is incidental to work tasks and occasional contact with co-workers, "no tandem tasks, and occasional supervision."  *Id.*   The preclusion of tandem tasks was included to account for Summers' testimony that "he preferred to work alone."  (Tr. 30.)   Summers argues that there should be no variance in his ability to interact with co-workers and supervisors compared to his ability to interact with the public, but the variance found by the ALJ in these areas is miniscule.   The ALJ imposed extensive limitations in both areas, commensurate with his finding of marked impairment in social functioning.   The ALJ's limitations are supported by the opinions of Drs. Nieder and Spencer, and *more restrictive* than the opinion of the prior administrative finding by Dr. Morgan.

The ALJ's mental RFC determination is supported by substantial evidence on the record as a whole.   In his discretion, the ALJ made an RFC finding that did not precisely reflect any of the medical opinions of record.   *See Martise*, 641 F.3d at 927 (ALJ is not required to rely entirely on one particular physician's opinion or choose between opinions).   The RFC is consistent with or more restrictive than all of the medical opinion evidence and prior administrative findings.   Even though the ALJ did not find ASD as a severe impairment, he indicated that "the treatment records clearly support some cognitive limitations that were also addressed with the residual functional capacity."   (Tr. 30.)   He limited Summers to simple, routine repetitive work with only occasional simple, work-related decisions, and no paced production quotas, to account for his cognitive limitations, memory issues, and difficulty concentrating.   (Tr. 30.)   The mental RFC formulated by the ALJ fully considered and accounted for Summers' mental functional limitations.

Summers points to other evidence in the record that is supportive of his application for benefits, but he has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of March, 2023.